IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>vs.<br><br>$32,780.00 IN UNITED STATES CURRENCY,<br><br>           Defendant,<br><br>RAYMOND RIVERA,<br><br>           Claimant. | 8:15CV131<br><br>FINDINGS AND RECOMMENDATION |

      This matter is before the court on the claimant's, Raymond Rivera (Rivera), Motion to Suppress Evidence (Filing No. 14). Rivera filed a brief (Filing No. 15) in support of the motion. The plaintiff, the United States of America, filed a brief (Filing No. 17) opposing the motion. The court held a hearing on August 25, 2015. Rivera was present with his counsel, Michael D. Nelson. Special Assistant United States Attorney Douglas J. Amen and Assistant United States Attorney Nancy A. Svoboda represented the plaintiff. The court received into evidence the video recording of the traffic stop (Exhibit 1). Deputy Eric Olson (Deputy Olson) of the Douglas County Sheriff's Department testified at the hearing. A transcript (TR.) of the hearing was filed on September 1, 2015 (Filing No. 26). At the hearing, the court requested supplemental briefing on the issue of standing. Rivera filed an amended supplemental brief (Filing No. 30) in support of his motion and the government filed a supplemental brief (Filing No. 31) in opposition.

BACKGROUND

      On November 6, 2014, at approximately 9:00 p.m., Deputy Olson of the Douglas County Sheriff's Department was traveling westbound on Interstate 80 (I-80) in his police cruiser (TR. 3, 9). Deputy Olson, a canine officer, was accompanied by his narcotics detection canine, Fletch (TR. 4-5). Deputy Olson has been paired with Fletch for approximately two years (TR. 4-5). Both Deputy Olson and Fletch completed

narcotics and patrol training and became certified together (TR. 8). Deputy Olson and Fletch are required to re-certify annually and were certified at the time of the traffic stop (TR. 6, 8). Deputy Olson explained narcotics certification entails familiarizing the canine with odors of heroin, cocaine, methamphetamine, and marijuana (TR. 6-7). During his patrol on November 6, 2014, Deputy Olson observed a white Mazda 6 (Mazda) traveling westbound on I-80 (TR. 9). Deputy Olson testified, as part of his criminal interdiction training, he identifies rental vehicles and the Mazda was a rental vehicle (TR. 42-43). Deputy Olson witnessed the Mazda's right tires cross the fog line for approximately twenty feet (TR. 10-11). Using his cruiser's speedometer, Deputy Olson observed the Mazda traveling approximately sixty-six or sixty-seven miles per hour (TR. 10-11). The posted speed limit on I-80 was sixty miles per hour. (TR. 10).

Based on these observations, Deputy Olson effectuated a traffic stop of the Mazda near the intersection of I-80 and Q Street (TR. 11). Deputy Olson noted three individuals were in the Mazda, who were later identified as: Adam Watson (Watson), the driver; Richard Aguirre (Aguirre), the front passenger; and Rivera, the back passenger (TR. 12, 17). Deputy Olson first spoke with Watson and explained Deputy Olson stopped Watson for speeding and driving on the shoulder (TR. 12). After Watson provided his driver's license to Deputy Olson, Watson accompanied Deputy Olson to the cruiser (TR. 13). In the cruiser, Deputy Olson asked Watson about the trip's itinerary and general questions about how the three occupants knew each other (TR. 14, 16). Watson told Deputy Olson the three were driving from Washington, D.C., where they had observed the election and the sights, including the Statue of Liberty (TR. 15-16; Ex. 1 at 21:05:18-26, 21:06:56-7:06, 21:07:16-19). Watson explained the Mazda was a rental car, but he could not find the rental agreement (TR. 13, 15; Ex. 1 at 21:05:12-14).

After speaking with Watson, Deputy Olson returned to the Mazda and asked for Aguirre's and Rivera's identifications (TR. 17). Aguirre produced identification (TR. 17). Rivera did not have any identification; however, he provided his name and date of birth (TR. 17-18). While Deputy Olson collected Aguirre's and Rivera's information, Deputy Olson inquired about their itinerary (TR. 18; Ex. 1 at 21:07:52). Aguirre stated the three were coming from the east coast, where they had visited the White House and the

Statue of Liberty (Ex. 1 at 21:07:53-8:07). Aguirre stated they had left California three or four days prior to drive to Washington, D.C., and New York City, and that they were driving back to California (Ex. 1 at 21:8:10-25; 21:8:36-41; 21:9:05-06). Deputy Olson asked Aguirre how many days they spent on the east coast, and Aguirre replied one (Ex. 1 at 21:10:06-16). Watson also stated they were in Washington, D.C., for about a day (Ex. 1 at 21:12:29-36). According to Deputy Olson, in his training and experience, it is not normal to drive approximately two days to sightsee for one day, and then turn around and drive home (TR 16). Deputy Olson asked both Aguirre and Rivera whether there was anything illegal inside the vehicle, and they both responded there was nothing illegal in the vehicle (TR. 18; Ex. 1 at 21:10:57-21:11:06). In response to Deputy Olson's question about previous arrests, Aguirre stated he had no prior arrests and Rivera admitted he had been arrested for "all kinds of different things" but did not mention any drug-related offenses (TR. 18-19; Ex. 1 at 21:10:45-53). Deputy Olson asked if they had any large amounts of cash in the Mazda (TR. 19; Ex. 1 at 21:11:07). Rivera asked what Deputy Olson considered a large amount of cash, and Deputy Olson stated he was interested in anything over $10,000 (TR. 19; Ex. 1 at 21:11:10-14). Rivera stated he had approximately $30,000 in the vehicle just in case he wanted to buy a car (TR. 19; Ex. 1 at 21:11:15-29). According to Deputy Olson, it is not common for the normal motoring public to travel with large amounts of cash (TR. 24). Deputy Olson asked Rivera if they went to look at any car in particular, but Rivera stated they did not look at cars (TR 25.; Ex. 1 21:11:58-12:10).

 Deputy Olson returned to his cruiser and requested criminal histories for Watson, Aguirre, and Rivera (TR. 26). During the criminal history check, Deputy Olson continued to ask Watson about the trip (TR. 28). Deputy Olson asked Watson if there were any large amounts of cash in the vehicle, and Watson stated he did not think so (TR. 29; Ex. 1 at 12:50-57). Deputy Olson asked Watson if there was anything illegal inside the vehicle, and Watson replied no (TR. 31; Ex. 1 at 21:12:45-48). Deputy Olson asked Watson if they had looked at vehicles to purchase, and Watson stated that Aguirre or Rivera had made some calls and possibly looked at one (Ex. 1 at 21:19:07-21). Watson also stated Rivera took the Mazda alone "for a little bit" while they were in

3

Washington, D.C., but Watson was not sure where Rivera went (Ex. 1 at 21:19:20:03-35).

During his records check, Deputy Olson contacted Omaha Police Department Officer Troy Liebe (Officer Liebe) to assist in the stop (TR. 30). Officer Liebe is also a canine handler (TR. 30). Officer Liebe arrived in his cruiser and pulled alongside of Deputy Olson (TR. 30).

Deputy Olson was informed there were no criminal histories for Watson or Aguirre (TR. 27). The dispatcher advised Deputy Olson that Rivera had three entries for felony drug charges on the Narcotics and Dangerous Drugs Information System (the system) (TR. 27). Deputy Olson testified Rivera had two cases in the system for distribution of methamphetamine and one for a cocaine sale (TR. 27). Deputy Olson completed his records check and gave Watson a warning for speeding and crossing onto the shoulder (TR. 30; Ex. 1 at 21:32:40-56). Deputy Olson returned all of Watson's and Aguirre's documents to Watson (TR. 30-31; Ex. 1 at 21:32:40-56). Deputy Olson then asked Watson if he would be willing to answer some more questions, and Watson agreed (TR. 31; Ex. 1 at 21:33:03-07). Deputy Olson asked Watson for permission to search the vehicle (TR. 31; Ex. 1 at 21:33:12-17). Watson explained he would like to get going, which Deputy Olson took as denial of consent (TR. 31; Ex. 1 at 21:33:12-17). Deputy Olson informed Watson Deputy Olson was going to walk a narcotics canine around the Mazda, and Watson replied, "Okay" (TR. 31; Ex. 1 at 21:33:18-22).

Deputy Olson told Watson to remain in the police cruiser, and updated Officer Liebe about Rivera's prior drug arrests, the $30,000 in cash in the Mazda, and the unusual travel story provided by the three individuals (Ex. 1 at 21:33:30-18). Deputy Olson approached the Mazda to speak to Aguirre and Rivera (TR. 31). Deputy Olson asked Rivera to exit the Mazda and informed Rivera that Deputy Olson was going to walk a narcotics canine around the vehicle (TR. 32). Initially when Rivera exited the vehicle, he told Deputy Olson he was a confidential informant, but Rivera was reluctant to provide any handler or point-of-contact information (TR. 32). Deputy Olson again asked Rivera about his prior arrests, but Rivera provided a vague response (TR. 32). Deputy Olson asked Rivera where the $30,000 was located and Rivera replied it was in

4

his "personal pouch" and gestured to the Mazda (Ex. 1 21:36:45-50). The canvas bag had a flap closed with Velcro (TR. 90-91).

After Deputy Olson's conversation with Rivera, Deputy Olson asked Aguirre to exit the Mazda (TR. 32). Rivera stood with Officer Liebe in front of Officer Liebe's cruiser, and Deputy Olson directed Aguirre to stand approximately 30 to 40 yards in front of the Mazda (TR. 32-33).

Once all three occupants were outside the Mazda, Deputy Olson deployed Fletch (TR. 33; Ex. 1 at 21:40:20). Fletch alerted several times to the odor of narcotics on the right passenger side of the Mazda, including the front and back door seams (TR. 33, 35-36; Ex. 1 at 21:40:57-41:58). Deputy Olson explained an alert is a narcotics detection canine's immediate change of behavior when the canine initially detects the odor of narcotics (TR. 36). An alert precedes an indication (TR. 36). Fletch's alert is a head snap followed by pulling Deputy Olson to the source of the odor of narcotics (TR. 35). A narcotics detection canine indicates when it detects the strongest source of the odor of narcotics (TR. 7). Fletch indicated to the odor of narcotics by standing and staring at the right passenger side of the Mazda (TR. 37-38; Ex. 1 at 21:42:28-29, 21:43:33-48). After Fletch indicated, Deputy Olson asked Watson why Fletch would indicate to the odor of narcotics coming from the Mazda (TR. 37-38; Ex. 1 at 21:44:24-46). Watson stated Rivera possibly smoked some marijuana (TR. 37-38; Ex. 1 at 21:44:24-46). Deputy Olson spoke to Rivera, who explained there were remnants of a marijuana cigarette on the rear passenger floorboard (TR. 38).

After speaking to Rivera, Deputy Olson and Officer Liebe searched the vehicle (TR. 38). Deputy Olson and Officer Liebe subsequently found $32,780.00 cash in a canvas bag, a marijuana cigarette on the right rear passenger floorboard, and a food saver machine in the trunk (TR. 38). Rivera claimed ownership of the canvas bag (TR. 56). Deputy Olson and Officer Liebe also found the Mazda's rental agreement, which reflected Watson rented the vehicle (TR. 39). Deputy Olson seized the currency and took Rivera into custody (TR. 39).

**ANALYSIS**

In a civil forfeiture action, the Fourth Amendment's exclusionary rule applies. See *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 646 (8th Cir. 1999). The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (**quoting** *Katz v. United States*, 389 U.S. 347, 357 (1967)).

In this case, Rivera challenges the legality of the initial traffic stop, his continued detention after the stop, and the warrantless search of the Mazda, and seeks all evidence obtained by law enforcement to be suppressed. See Filing No. 15 - Brief p. 2-6. The government argues Rivera lacks standing to challenge the stop and search of the Mazda because he was merely a passenger. See Filing No. 17 - Response p. 2-6. The government further argues the initial traffic stop and subsequent detention and search were lawful. *Id*. at 9.

**A.   Standing**

The government asserts Rivera does not have standing to challenge the search of the Mazda because he was merely a passenger. See Filing No. 17 - Response p. 9. Generally, a mere passenger does not have standing to challenge a vehicle search where he has "neither a property nor a possessory interest in the automobile." *Rakas v. Illinois*, 439 U.S. 128, 148 (1978). "It is well-established that 'Fourth Amendment rights are personal rights that may not be asserted vicariously.'" *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (**quoting** *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004)). "An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Anguiano*, 795 F.3d at 878 (internal quotations omitted). A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched [ ] has no standing to claim that they were searched . . .

6

illegally." *Id.* (**quoting** *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). Factors relevant to the determination of standing include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Anguiano*, 795 F.3d at 878. The *Anguiano* court concluded a defendant failed to demonstrate a sufficiently close connection to the vehicle stopped and searched by law enforcement because the defendant was not an owner, registered user, or driver of the vehicle when it was stopped; rather, he was merely a passenger. *Id*. Although there was no evidence the defendant in *Anguiano* had ever driven the vehicle or possessed a valid driver's license, the court stated that even if the defendant had driven the vehicle himself at some point, he provided no evidence of consent or permission from the vehicle's lawful owner. *Id.*

Rivera claims the evidence shows he was permitted to drive the Mazda unaccompanied for a day while they were in Washington, D.C., which he argues satisfies the possessory interest necessary to establish standing to challenge the search of the Mazda. **See** Filing No. 30 - Am. Supp. Brief p. 1. Rivera cites to *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998) and *Nebraska v. Nelson*, 807 N.W.2d 769 (Neb. 2011), to support his position that an unauthorized driver of a rental vehicle may establish standing to contest a search of the rental vehicle if there is evidence the authorized renter gave the unauthorized driver permission. **See** Filing No. 30 - Am. Supp. Brief p. 1-2. In *Best*, the Eighth Circuit noted, without deciding, an unlicensed and unauthorized driver of a rental vehicle may have standing to challenge the legality of an inventory search if the renter of the vehicle had granted him permission to use the vehicle, but remanded the case for the district court to make a factual determination on the issue. *Best*, 135 F.3d at 1225. Similarly, in *Nelson*, the Nebraska Supreme Court held "a driver of a rental vehicle may have standing to challenge a detention or search if he or she has demonstrated that he or she has received permission to drive the vehicle

7

from the individual authorized on the rental agreement." *Nelson*, 807 N.W.2d at 780. The defendant in *Nelson* was not an authorized driver on the rental agreement, but he was given permission to drive the vehicle. *Id.* at 774.

Unlike the defendants in *Best* and *Nelson*, Rivera was not driving the Mazda when it was stopped. Watson, the only authorized renter of the Mazda, was driving the vehicle when Deputy Olson initiated the traffic stop. Rivera was a back-seat passenger at the time of the traffic stop, and he did not even possess a valid driver's license. Although Watson indicated Rivera took the Mazda alone somewhere "for a little bit," while they were in Washington, D.C., such brief and limited use of the Mazda over the course of a multiple day trip is insufficient to give rise to a legitimate and reasonable expectation of privacy. Because Rivera was not an owner, registered user, or driver of the Mazda when it was stopped, and was merely a passenger without a valid driver's license, the court concludes he failed to establish a sufficient connection to the Mazda to have standing to challenge the search of the Mazda itself.

Rivera's motion only broadly challenges the general search of the vehicle, **see** Filing No. 14 - Motion ¶¶ 1, 3-5, but he does claim he had a legitimate expectation of privacy in his personal bag in which the currency was found. **See** Filing No. 30 - Am. Supp. Brief p. 2. "The owner of a suitcase located in another's car may have a legitimate expectation of privacy with respect to the contents of his suitcase." *United States v. Buchner*, 7 F.3d 1149, 1154 (5th Cir. 1993); s**ee also** *Bond v. United States*, 529 U.S. 334, 336-39 (2000) (holding bus passenger had legitimate expectation of privacy in his luggage stored inside the bus); *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (concluding passenger who did not have standing to contest the search of the car nevertheless had standing to challenge the search of his bag, which contained his business cards, computer flash drives, and photographs of his children); *United States v. Iraheta*, 764 F.3d 455, 461-62 (5th Cir. 2014) (concluding passengers in a car had standing to challenge search of their luggage); *United States v. Edwards*, 632 F.3d 633, 641-42 (10th Cir. 2001) (concluding defendant lacked standing to challenge the search of a rental car because he was not an authorized driver on the rental agreement; however he did have standing to challenge the search of his luggage located in the rental car's trunk); *United States v. Macklin*, 902 F.2d 1320,

1330-31 n.12 (8th Cir. 1990) (noting defendant may have a legitimate expectation of privacy in his luggage in another's car, although he did not have standing to challenge the search of the car's trunk).

In the present case, the record reflects Rivera was the back-seat passenger in the Mazda, and the canvas bag containing the currency was located on the right rear passenger floorboard (TR. 39, 56). Prior to the search, when Deputy Olson asked Rivera where the $30,000 was located, Rivera replied it was in his "personal pouch" and gestured to the Mazda (Ex. 1 21:36:45-50). The canvas bag had a flap closed with Velcro (TR. 90-91). Given the closed canvas bag's proximity to Rivera, and his claim of ownership of the bag prior to the search, the court concludes that Rivera has established he had a legitimate expectation of privacy in the canvas bag sufficient to challenge its search.

Finally, Rivera challenges the seizure and detention of his person. **See** Filing No. 14 - Motion ¶¶ 1-3. The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver "even though the purpose of the stop is limited and the resulting detention quite brief." ***Brendlin v. California***, 551 U.S. 249, 255, (2007) (**quoting *Delaware v. Prouse***, 440 U.S. 648, 653 (1979)). A passenger in a vehicle is also seized during a traffic stop and thus may challenge the stop itself. **See *Brendlin***, 551 U.S. at 255; **see also *United States v. Crippen***, 627 F.3d 1056, 1063 (8th Cir. 2010) (concluding a passenger is seized for Fourth Amendment purposes during a traffic stop and thus may challenge it). Therefore, Rivera, as a passenger in the stopped Mazda, has standing to challenge the traffic stop and his detention.

**B.     Traffic Stop**

"A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause." ***United States v. Houston***, 548 F.3d 1151, 1153 (8th Cir. 2008); **see also *United States v. Hollins***, 685 F.3d 703, 705-06 (8th Cir. 2012). "A traffic violation, no matter how minor, provides an officer with probable cause to stop the driver. An officer is justified in stopping a motorist when the officer objectively has a reasonable basis for believing that the driver has breached a traffic law." ***United States v. Coleman***, 700 F.3d 329, 334 (8th Cir.

9

2012) (internal quotations and citations omitted). "An otherwise constitutional traffic stop is not invalidated by the fact that it was mere pretext for a narcotics search." **United States v. Wright**, 512 F.3d 466, 471 (8th Cir. 2008) (internal quotation marks omitted); **see** also **United States v. Frasher**, 632 F.3d 450, 453 (8th Cir. 2011).

Rivera "questions the legitimacy of the stop," and argues "any mistake by Deputy Olson [in making the stop] was not objectively reasonable." **See** Filing No. 15 - Brief p. 3. Deputy Olson observed Watson drive the Mazda traveling at sixty-six or sixty-seven miles per hour (TR. 11). According to Neb. Rev. Stat. § 60-6,186 of the Nebraska Rules of the Road:

> [N]o person shall drive a vehicle on a highway at a speed in excess of such maximum limits:
> ...
> (e) Sixty miles per hour upon any part of the state highway system other than an expressway or a freeway, except that the Department of Roads may, where existing design and traffic conditions allow, according to an engineering study, authorize a speed limit five miles per hour greater;

Neb. Rev. Stat. § 60-6,186(1).

Watson was driving the Mazda in excess of sixty-miles per hour, in violation of Neb. Rev. Stat § 60-6,186(1)(e). As failing to obey the posted speed limit is a violation of the Nebraska Rules of the Road, Deputy Olson had probable cause to conduct the traffic stop.

Additionally, Deputy Olson observed Watson drive the right tires of the Mazda over the fog line and onto the shoulder of I-80 for approximately twenty feet (TR. 10). Neb. Rev. Stat. § 60-6,142 provides, with three exceptions inapplicable in this situation, "[n]o person shall drive on the shoulders of highways[.]" In **Nebraska v. Magallanes**, 824 N.W.2d 696 (Neb. 2012), the Supreme Court of Nebraska concluded, "any crossing of the fog line, even momentarily and inadvertently crossing onto the shoulder, is enough to violate [§ 60–6,142]." **Magallanes**, 824 N.W.2d at 700. Thus, the Mazda's momentary crossing of the fog line constituted a violation of Neb. Rev. Stat. § 60-6,142.

Deputy Olson observed Watson commit two traffic violations, either of which would be sufficient to initiate a traffic stop. **See Coleman**, 700 F.3d at 334 ("A traffic

10

violation, no matter how minor, provides an officer with probable cause to stop the driver."). Therefore the initial traffic stop was lawful.

**C.    Detention**

Rivera argues Deputy Olson prolonged the stop and Rivera's detention without reasonable suspicion of criminal activity. **See** Filing No. 15 - Brief p. 3-4. Contemporaneous with a valid traffic stop, an officer may "conduct an investigation that is reasonably related in scope to the circumstances that initially justified the stop." ***United States v. Bracamontes***, 614 F.3d 813, 816 (8th Cir. 2010). An officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license, and criminal history. ***United States v. Quintero-Felix***, 714 F.3d 563, 567 (8th Cir. 2013); **see also** ***United States v. Sokolow***, 490 U.S. 1, 7 (1989). Also, an officer may request the driver sit in the patrol car to answer questions about his itinerary. ***Quintero-Felix***, 714 F.3d at 567. Additionally, an officer may inquire about the driver and other occupants' destination, purpose of the trip, and whether the police officer may search the vehicle. ***United States v. Mendoza***, 677 F.3d 822, 828 (8th Cir. 2012); ***United States v. Olivera-Mendez***, 484 F.3d 505, 511 (8th Cir. 2007) (finding no unreasonable seizure occurred during traffic stop based on probable cause when officer asked three questions about drug possession, which were unrelated to the traffic stop). An officer may ask for identification from passengers and run background checks on them. ***United States v. Rice***, 483 F.3d 1079, 1084 (10th Cir. 2007); ***United States v. Jenson***, 462 F.3d 399, 403-04 (5th Cir. 2006); ***United States v. Purcell***, 236 F.3d 1274, 1278 (11th Cir. 2001).

As part of the valid traffic stop, Deputy Olson performed a number of routine but somewhat time-consuming tasks attendant to the traffic stop. After Watson told Deputy Olson about their unusual travel itinerary, Deputy Olson returned to the Mazda to speak with Aguirre and Rivera to verify Watson's summary (TR. 18). Deputy Olson's questioning of Watson, Aguirre, and Rivera was properly within the lawful scope of the traffic stop. **See** ***United States v. Pena-Ponce***, 588 F.3d 579, 584 (8th Cir. 2009) (stating an officer may ask passengers questions about a travel itinerary in order to verify the information provided by the driver). While verifying Watson's information,

Deputy Olson also lawfully and appropriately requested Aguirre's and Rivera's identifications.  **See** *Rice*, 483 F.3d at 1084.  Upon receipt of their names and identifying information, Deputy Olson properly conducted background checks on all three occupants.  **See** *id.*; *United States v. Slater*, 411 F.3d 1003, 1006 (8th Cir. 2005) (providing identification to an officer can be considered a voluntary act by a passenger and consent to a routine, computerized records check).  Deputy Olson had not yet completed his tasks associated with the traffic stop when he requested all three individuals' criminal histories and therefore, did not unreasonably extend the length of the stop when he requested such information and performed routine tasks associated with the traffic stop.

The existence of reasonable suspicion or consent allows an officer to extend the duration and scope of a traffic stop.  *Quintero-Felix*, 714 F.3d at 567.  Police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a canine sniff.  **See** *Rodriguez v. United States*, 135 S. Ct. 1609, 1614-15 (2015).  "If reasonable suspicion exists, officers may briefly detain a vehicle and its occupants to conduct a reasonable investigation."  *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012).  "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot, the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions."  *Minnesota v. Dickerson*, 508 U.S. 366, 372-73 (1993) (**quoting** *Terry v. Ohio*, 392 U.S. 1, 30 (1968)) (internal quotation marks omitted); **see also** *United States v. McCarty*, 612 F.3d 1020, 1025 (8th Cir. 2010) (noting circumstances may suggest "suspicion was reasonably warranted and [officer] was justified in expanding the traffic stop to ask [the suspect] about the presence of drugs in the car").  The reasonable suspicion necessary to justify an investigatory stop must include "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21; **see** *United States v. Allen*, 705 F.3d 367, 370 (8th Cir. 2013).  "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop."  *United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012).  "The

standard is less difficult to meet than the probable cause standard required for arrests." ***United States v. Long***, 532 F.3d 791, 795 (8th Cir. 2008).

The court gives law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." ***United States v. Winarske***, 715 F.3d 1063, 1067 (8th Cir. 2013). This is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" ***United States v. Mendoza***, 421 F.3d 663, 667 (8th Cir. 2005). Accordingly, "[w]hether [the officers'] suspicions are reasonable is assessed from the point of view of trained law enforcement officers based on the totality of the circumstances known to the officers at the relevant time." ***Zamora-Lopez***, 685 F.3d at 790.

During the course of conducting routine traffic stop tasks, Deputy Olson became aware of facts that led him to believe criminal activity may be afoot. First, the Mazda's occupants provided an unusual explanation and purpose of their trip. Watson told Deputy Olson they had driven from California to spend one day in Washington, D.C., to see the sights and observe the election. Watson also told Deputy Olson they had seen the Statue of Liberty in Washington, D.C. Aguirre told Deputy Olson they had left California three or four days prior and spent only one day on the east coast in both Washington, D.C., and New York City. According to Deputy Olson, in his training and experience, it is not normal to drive approximately two days to sightsee for one day, and then turn around and drive home (TR 16). Deputy Olson also testified that as part of his criminal interdiction training, he looks to identify rental vehicles, and the Mazda was a rental vehicle (TR. 42-43). Next, when Deputy Olson asked Rivera whether there were any large amounts of cash in the Mazda, in particular, more than $10,000, Rivera admitted he had approximately $30,000 in cash. Rivera's explanation was that he had the large amount of cash "just in case" he wanted to buy a car, but he did not have a particular car in mind and did not even go look at a car (TR 25; Ex. 1 21:11:58-12:10). When Deputy Olson asked Watson whether there were any large amounts of cash in the Mazda, he stated he did not think so. However, when Deputy Olson asked Watson if they had looked at vehicles to purchase on their trip, Watson replied that Aguirre or Rivera possibly looked at one. Watson stated Rivera took the Mazda alone "for a little

13

bit" while they were in Washington, D.C., but Watson was not sure where Rivera went. According to Deputy Olson, it is not common for the normal motoring public to travel with large amounts of cash (TR. 24).  Finally, during Deputy Olson's records check of all three occupants of the Mazda, he learned that Rivera had three entries for felony drug charges in the system, two for distribution of methamphetamine and one for a cocaine sale (TR. 27).  When Deputy Olson had originally asked Rivera about his prior arrests, Rivera had not mentioned any prior arrests for drug-related offenses.

Based on the above information and totality of the circumstances Deputy Olson discovered while performing the routine tasks associated with the traffic stop, the court concludes he had reasonable suspicion to extend the duration and scope of the traffic stop after it was completed to conduct a reasonable investigation, which investigation included the canine sniff of the Mazda.  **See *Rodriguez***, 135 S. Ct. at 1614-15 (holding police may extend an otherwise-completed traffic stop in order to conduct a canine sniff if the officer has reasonable suspicion); ***Quintero-Felix***, 714 F.3d at 567 (holding the existence of reasonable suspicion allows an officer to extend the duration and scope of a traffic stop).

**D.    Search**

Rivera generally challenges the warrantless search of the vehicle.  **See** Filing No. 14 - Motion ¶¶ 1, 2-4.  However, as discussed above, Rivera has standing only to contest the search of his canvas bag.  "Under the automobile exception to the Fourth Amendment, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband or other evidence of a crime." ***United States v. Winarske***, 715 F.3d 1063, 1068 (8th Cir. 2013) (internal quotations omitted).  Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." ***United States v. Grubbs***, 547 U.S. 90, 95 (2006) (**quoting *Illinois v. Gates***, 462 U.S. 213 (1983)).  "If probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." ***United States v. Ross***, 456 U.S. 798, 825 (1982).  Police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is

contained.  *California v. Acevedo*, 500 U.S. 565, 580 (1991).  A canine sniff of the exterior of a vehicle does not constitute a search.  *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005); **see also** *Olivera-Mendez,* 484 F.3d at 511-12.  "Assuming that the [canine] is reliable, a [canine] sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." *United States v. Donnelly*, 475 F.3d 946, 954-55 (8th Cir. 2007); **see also** *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir. 1999).  A drug detection canine is considered reliable when it has been "trained and certified to detect drugs." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010) (**quoting** *Olivera-Mendez*, 484 F.3d at 512).

Deputy Olson is a canine officer and has been paired with Fletch for approximately two years (TR. 4-5).  Both Deputy Olson and Fletch completed narcotics and patrol training and became certified together (TR. 8).  Deputy Olson and Fletch are required to re-certify annually and were certified at the time of the traffic stop (TR. 6, 8). Deputy Olson explained narcotics certification entails familiarizing the canine with odors of heroin, cocaine, methamphetamine, and marijuana (TR. 6-7).  Deputy Olson's testimony established Fletch had been trained and certified to detect drugs.  Therefore, the court finds Fletch was reliable.  **See** *Winters*, 600 F.3d at 967 (concluding a drug detection canine is considered reliable when it has been trained and certified to detect drugs).

According to both the video recording of the traffic stop and Deputy Olson's testimony, Fletch alerted then indicated to the right passenger side of the Mazda. Fletch's indication established probable cause to believe there were drugs present.  **See** *Donnelly*, 475 F.3d at 954-55; *Sundby*, 186 F.3d at 875-76.  Deputy Olson thereafter had probable cause to search the Mazda and containers, including Rivera's canvas bag, that could contain drugs.  **See** *Acevedo*, 500 U.S. at 580 (holding police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained).  Moreover, Rivera admitted he had approximately $30,000 in cash in his bag and a marijuana cigarette was recovered nearby, further providing Deputy Olson with probable cause to search Rivera's bag.

15

As discussed in more detail above, Rivera does not have standing to challenge the search of the Mazda itself. However, Rivera does have standing to challenge the legality of the traffic stop, his detention, and the search of his bag. Deputy Olson had probable cause to initiate the traffic stop and did not unreasonably extend the length of the stop while performing routine tasks. Deputy Olson had reasonable suspicion to extend the otherwise-completed traffic stop in order to conduct the canine sniff with Fletch. Fletch's reliability was established through his training and certification to detect drugs. Fletch indicated to the odor of narcotics in the Mazda, which provided Deputy Olson with probable cause to believe drugs were present. Deputy Olson therefore had probable cause to conduct a warrantless search of the Mazda and containers within it that could contain drugs. Upon consideration,

**IT IS RECOMMENDED TO SENIOR JUDGE JOSEPH F. BATAILLON that:**
Raymond Rivera's Motion to Dismiss (Filing No. 14) be denied.

## ADMONITION

Pursuant to NECivR 72.3 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 30th day of September, 2015.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge